UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL RIVERA, | : | **CASE NO. 3:19-CV-00976** |
| Plaintiff | : | |
| | : | |
| | : | (Chief Magistrate Judge Schwab) |
| v. | : | |
| | : | |
| KEVIN MONKO, WYNSTON | : | |
| GILBERT, and JOHN DOE | : | |
| Defendants | : | |

## <u>MEMORANDUM OPINION</u>

## I.  Introduction.

The plaintiff Michael Rivera ("Rivera") claims that the defendants intentionally denied him meaningful access to the courts by preventing him from conducting legal research before and during his trial in a separate case.  Two of the three defendants have moved to dismiss Rivera's amended complaint.  Because the defendants are entitled to qualified immunity, we will grant the moving defendants' motion to dismiss.  We will also dismiss the claims against the third defendant on the basis of qualified immunity.

## II.  Background and Procedural History.

Rivera began this action in the Court of Common Pleas of Luzerne County, Pennsylvania.  The defendants removed the case to this court on June 6, 2019.

Rivera subsequently filed an amended complaint naming as defendants Kevin

Monko ("Monko"), a lieutenant at the State Correctional Institution Retreat ("SCI

Retreat"); Wynston Gilbert ("Gilbert"), a sergeant at SCI Retreat; and John Doe

("Doe"), a librarian at SCI Retreat.  Rivera claims that the defendants denied him

access to the courts in connection with his case in *Rivera v. O'Haire,* No. 1:15-cv-

1659 (M.D. Pa.).

Rivera alleges the following facts.  On July 6, 2017, he was temporarily

transferred to SCI Retreat to litigate, *pro se*, his case in connection with a civil jury

trial in *Rivera v. O'Haire,* before Magistrate Judge Mehalchick.  According to

Rivera, *Rivera v. O'Haire* was a nonfrivolous claim challenging his conditions of

confinement.[1]

Shortly after his arrival at SCI Retreat, Rivera asked defendant Monko for

access to the facility's restricted housing unit's mini law library.  Later that same

---

[1]  The court may take judicial notice of adjudicative facts that are not subject to
reasonable dispute because they are "generally known within the trial court's
territorial jurisdiction" or because they "can be accurately and readily determined
from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid.
201(b)(2).  "We may take judicial notice of the contents of another Court's
docket." *Orabi v. Attorney Gen. of the U.S.*, 738 F.3d 535, 537 n.1 (3d Cir. 2014);
*see also Wilson v. McVey*, 579 F. Supp. 2d 685, 688 (M.D. Pa. 2008) (taking
judicial notice of the state court docket).  Base on the docket in *Rivera v. O'Haire*,
we note that Rivera's claims at trial were excessive force claims against three
officers. *See doc. 81* in *Rivera v. O'Haire,*  No. 1:15-cv-1659 (M.D. Pa.).

day—July 7, 2017, defendant Monko told Rivera that he would get him into the mini law library that same day.  Rivera explained that he would need continuing access to the law library during his trial, and Monko agreed to provide as much access as possible.

Later that evening, defendant Gilbert and a non-party officer escorted Rivera to the mini law library.  The mini law library did not contain any books.  Rather, it contained two computers.  But both of the computers were inoperable; neither Rivera nor defendant Gilbert could log into the research software on the computers in the mini law library.  As a result, Rivera could not do any research into the Federal Rules of Civil Procedure for his upcoming trial.  Defendant Gilbert told Rivera he would consult with Lieutenant Monko and the law librarian on Monday[2] and try to get the computers fixed.  Rivera was then escorted back to his cell.

The next day Rivera complained about the computers again, explaining that he needed to research the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  A nonparty sergeant told Rivera that nobody could come to fix the computers until Monday.  Rivera then requested to borrow physical books from the general-population law library.  The sergeant said he called the librarian, defendant Doe, who denied Rivera's request for books.  According to Rivera, defendant Doe

---

[2]  We note that July 7, 2017, was a Friday, and the following Monday was July 10, 2017.

knew, or should have known, that the mini law library computers were not functional, but he still denied Rivera's request for books, which frustrated Rivera's ability to respond to pretrial motions and discovery issues that arose prior to trial in *Rivera v. O'Haire*.

Rivera's trial in *Rivera v. O'Haire* began on Monday, July 10, 2017, and after court on that date, he discovered that the computers in the mini law library still had not been fixed. Rivera asked again about borrowing physical books from the law library. Defendant Gilbert told Rivera it was Defendant Doe's policy not to loan out reference books. According to Rivera, without access to any legal reference materials, his ability to respond to motions presented at trial was frustrated and impeded.

The next day, Rivera testified in court during his trial. But he was unable to admit an unsworn declaration and medical records to the jury because Judge Mehalchick ruled that those documents were hearsay. According to Rivera, Judge Mehalchick considered those documents hearsay because he did not testify about them while on the witness stand. Rivera contends that if he had been allowed access to the reference materials that he had requested at SCI Retreat, he would have known that he needed to testify about those documents. The jury returned a verdict against Rivera that same day. According to Rivera, it was the adverse hearsay ruling on the documents that led to the verdict against him.

Rivera alleges that in addition to being denied access to research materials during his trial in *Rivera v. O'Haire*, during a prior and subsequent stay at SCI Retreat he was also denied access to the mini law library.[3]

Contending that the defendants conspired to frustrate and impede his ability to research and prepare for issues that arose before, during, and after his trial in *Rivera v. O'Haire*, Rivera claims that the defendants denied him access to the courts in violation of the First Amendment. He seeks declaratory and injunctive relief as well as compensatory and punitive damages.

On September 25, 2019, defendants Monko and Gilbert filed a motion to dismiss the amended complaint. They later filed a brief in support of that motion, Rivera filed a brief in opposition, and defendants Monko and Gilbert filed a reply brief.

The parties have consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.

---

[3] According to the exhibits Rivera attached to his amended complaint, he was not allowed to go to the mini law library while temporarily housed at SCI Retreat from May 16, 2017, to May 25, 2017. *Doc. 19* at 13. And he allegedly was not allowed to go to the mini law library in August of 2017, when he was again temporarily housed at SCI Retreat, and he was told at that time that the computers were not working. *Id*. at 16.

### III.  Federal Rule of Civil Procedure 12(b)(6) and pleading standards.

In accordance with Fed.R.Civ.P. 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  When reviewing a motion to dismiss under Rule 12(b)(6), "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  In making that determination, we "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769–70 (M.D. Pa. 2012).  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting Fed.R.Civ.P. 8(a)(2)).  The statement required by Rule 8(a)(2) must give the defendant fair notice of the nature of the plaintiff's claim and of the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Detailed factual allegations are not required, but more is required

than "labels," "conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). "A complaint has to 'show' such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court "'must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party.'" *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 437 (3d Cir. 2018) (quoting *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015)). But a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997). A court also need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a
> plaintiff must plead to state a claim." Second, the court should
> identify allegations that, "because they are no more than
> conclusions, are not entitled to the assumption of truth."
> Finally, "where there are well-pleaded factual allegations, a
> court should assume their veracity and then determine whether
> they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010) (footnote and

citations omitted) (quoting *Iqbal,* 556 U.S. at 675, 679).

A complaint filed by a *pro se* litigant is to be liberally construed and

"'however inartfully pleaded, must be held to less stringent standards than formal

pleadings drafted by lawyers.'" *Erickson,* 551 U.S. at 94 (quoting *Estelle v.

Gamble,* 429 U.S. 97, 106 (1976)). Nevertheless, "pro se litigants still must allege

sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina,

Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).


## IV.  Discussion.

Defendants Monko and Gilbert contend that the amended complaint fails to

state a claim upon which relief can be granted. They contend that Rivera did not

suffer an injury to his right of access to the court because he was not shut out of

court, but rather he litigated his claims in *Rivera v. O'Haire* at trial. They further

contend that Rivera's purported injury is speculative as he has not alleged how

access to research materials would have changed hearsay into non-hearsay or

changed Judge Mehalchick's ruling. They further contend that it is speculation to

posit that the documents that Rivera wished to admit would have changed the jury's verdict given that Rivera did testify at trial.  The defendants also contend that they did not interfere with Rivera's access to legal research; rather, they were simply unable to fix the computers in the mini law library.

The defendants further contend that that they are entitled to qualified immunity.  In this regard, they contend that there is no established case law that access to legal materials while in trial is a constitutional right or that corrections officers must be proficient in, or maintain the software on, law library computers. For the following reasons, we conclude that the defendants are entitled to qualified immunity.

### A.  Qualified Immunity Standards.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.*  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

The qualified immunity analysis has two prongs. *Id.* at 232.  One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.*  The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  The court is permitted to exercise its discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances of the particular case. *Pearson,* 555 U.S. at 236.  So, the court may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.*

Here, we turn to whether the law was clearly established.  This "qualified immunity analysis looks through the rearview window, not the windshield." *Williams v. Secretary PA Dept. of Corrections*, 848 F.3d 549, 570 (3d Cir. 2017). "The inquiry focuses on the state of the relevant law when the violation allegedly occurred." *Id*.

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). In other words, "[t]he rule must be 'settled law,' which means it is dictated by

'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'"

*Id*. at 589–90 (internal citations omitted).  "It is not enough that the rule is

suggested by then-existing precedent." *Id*. at 590.  Rather, "[t]he precedent must be

clear enough that every reasonable official would interpret it to establish the

particular rule the plaintiff seeks to apply." *Id*.  Still, "the facts of the existing

precedent need not perfectly match the circumstances of the dispute in which the

question arises." *Williams*, 848 F.3d at 570.  But if the law did not put the officer

on notice that his conduct would be clearly unlawful, qualified immunity is

appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186,

193 (3d Cir. 2009).  "In other words, 'existing precedent must have placed the

statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 566 U.S.

658, 664 (2012) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)).  "This

exacting standard 'gives government officials breathing room to make reasonable

but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those

who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 135

S. Ct. 1765, 1774 (2015) (quoting *al-Kidd*, 563 U.S. at 743).

"While the plaintiff must sufficiently plead a violation, the burden is on the

defendants to establish they are entitled to qualified immunity." *E. D. v. Sharkey*,

928 F.3d 299, 306 (3d Cir. 2019).  "Officials demonstrate they are entitled to

qualified immunity only if they can show that a reasonable person in their position

at the relevant time could have believed, in light of clearly established law, that

their conduct comported with recognized legal standards." *Id*.

### B. Access-to-the-Courts Standards.

"It is now established beyond doubt that prisoners have a constitutional right

of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977).[4]  In the

context of a prisoner's right of access to the courts, more is required than that the

government not hinder access to the courts. *See generally Brown v. Grabowski*,

922 F.2d 1097, 1113 (3d Cir. 1990) (observing that "[t]he due process clause of the

fourteenth amendment imposes upon state actors an obligation to refrain from

preventing individuals from obtaining access to the civil courts[,]  [b]ut only when

the state has custody of an individual must its actors, to ensure that the individual

receives due process, provide assistance in gaining access to the courts" (citations

omitted)).  Rather, states "shoulder affirmative obligations to assure all prisoners

meaningful access to the courts." *Bounds*, 430 U.S. at 824.  In *Bounds*, the Court

held that "the fundamental constitutional right of access to the courts requires

prison authorities to assist inmates in the preparation and filing of meaningful legal

---

[4]  "The right of access to the courts is sourced from both 'the First and Fourteenth
Amendments,' and is typically framed as a due process right in the inmate context,
but in other contexts as 'an aspect of the First Amendment right to petition the
Government for redress of grievances[.]'" *Jutrowski v. Twp. of Riverdale*, 904 F.3d
280, 295 n.17 (3d Cir. 2018) (citations omitted).

papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id*. at 828.  "'[M]eaningful access' to the courts is the touchstone." *Id.* at 823 (quoting *Ross v. Moffitt*, 417 U.S. 600, 611, 612, 615 (1974)).

"A prisoner's constitutional right of access to the courts is undiminished when that prisoner is held in a segregated unit." *Peterkin v. Jeffes*, 855 F.2d 1021, 1038 (3d Cir. 1988).  Following *Bounds*, the Third Circuit described the standard to be applied in this context:

> As we can best determine, the standard to be applied is whether the legal resources available to a prisoner will enable him to identify the legal issues he desires to present to the relevant authorities, including the courts, and to make his communications with and presentations to those authorities understood.  Thus, in order for segregated prisoners, who do not have access to an institution's main law library, to obtain legal access of "equal caliber" to the main library's resources, there must be some means by which documents and materials, which are not themselves available to the segregated inmates, can be identified by and furnished to such inmates in a timely fashion.

*Abdul-Akbar v. Watson*, 4 F.3d 195, 203 (3d Cir. 1993) (citation omitted).

Nearly two decades after *Bounds*, the Supreme Court decided *Lewis v. Casey*, 518 U.S. 343, 349 (1996), holding that "an inmate alleging a violation of *Bounds* must show actual injury" to his right of access to the courts.  In the process of so holding, the Court clarified that *Bounds* did not establish a right to a law library or to legal assistance. *Id*. at 350.  Rather, "[t]he right that *Bounds*

acknowledged was the (already well-established) right of *access to the courts.*" *Id.*
(italics in original).  And although *Bounds* "affirmed a court order requiring North
Carolina to make law library facilities available to inmates, it stressed that that was
merely 'one constitutionally acceptable method to assure meaningful access to the
courts,' and that '[its] decision . . . does not foreclose alternative means to achieve
that goal.'" *Id.* at 350–51 (quoting *Bounds*, 430 U.S. at 830).  "In other words,
prison law libraries and legal assistance programs are not ends in themselves, but
only the means for ensuring 'a reasonably adequate opportunity to present claimed
violations of fundamental constitutional rights to the courts.'" *Id.* at 351 (quoting
*Bounds*, 430 U.S. at 825).

"Because *Bounds* did not create an abstract, freestanding right to a law
library or legal assistance, an inmate cannot establish relevant actual injury simply
by establishing that his prison's law library or legal assistance program is subpar in
some theoretical sense." *Id.*  Instead, an inmate must "demonstrate that the alleged
shortcomings in the library or legal assistance program hindered his efforts to
pursue a legal claim." *Id.*  The *Lewis* court gave some examples of ways in which
an inmate might show actual injury. *Id.*  "He might show, for example, that a
complaint he prepared was dismissed for failure to satisfy some technical
requirement which, because of deficiencies in the prison's legal assistance
facilities, he could not have known." *Id.*  "Or that he had suffered arguably

actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." *Id.*

The *Lewis* court also narrowed *Bounds*, disclaiming some overly broad statements made in *Bounds*:

> It must be acknowledged that several statements in *Bounds* went beyond the right of access recognized in the earlier cases on which it relied, which was a right to bring to court a grievance that the inmate wished to present. These statements appear to suggest that the State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court. These elaborations upon the right of access to the courts have no antecedent in our pre-*Bounds* cases, and we now disclaim them. To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is effectively to demand permanent provision of counsel, which we do not believe the Constitution requires.

*Id.* at 354 (citations omitted).

The *Lewis* court also clarified that "the injury requirement is not satisfied by just any type of frustrated legal claim." *Id.* Rather, "the tools [*Bounds*] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id.* at 355. "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* (italics in original).

Another seminal access-to-the-courts case, albeit one that did not arise in the prison context, is *Christopher v. Harbury*, 536 U.S. 403 (2002). In that case, the Court explained that there are two general categories of actionable federal claims based upon an alleged denial of access to the courts. *Id.* 413. The first category is forward-looking claims. *Id.* The essence of such a claim is that official action is frustrating the plaintiff in preparing or filing a legal action at the present time. *Id.* The opportunity to litigate "has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* The second category is backward-looking claims. *Id.* at 413–14. Such a claim does not look forward to future litigation, "but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414 (footnotes omitted). "The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." *Id.*

The ultimate justification for recognizing each kind of access claim is the same. *Id.* "Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access

claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414–15.  The right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415.  Therefore, a plaintiff must establish an actual injury by identifying a nonfrivolous, arguable underlying claim blocked or lost by the alleged denial of access to the courts. *Id.*  The underlying cause of action, whether anticipated or lost, is an element of the access claim. *Id.*

### C.  The defendants are entitled to qualified immunity.

Here, Rivera claims that the defendants denied him access to the courts by denying him access any legal materials including the Federal Rules of Civil Procedure and the Federal Rules of Evidence during his trial in *Rivera v. O'Haire*. Rivera contends that the adverse ruling on the admissibility of his declaration and medical records could have been avoided if the defendants had not conspired to deny him access to legal research materials.  And he posits that had his declaration and medical records been admitted at trial, the verdict at trial in *Rivera v. O'Haire* would have been different.  Rivera's claim is a backward looking-claim: he contends that he lost his excessive-force claims in *Rivera v. O'Haire* at trial because the defendants hindered his access to legal materials.

As mentioned above, the defendants contend that they are entitled to qualified immunity in part because there is no established case law that access to

17

legal materials while in trial is a constitutional right.  In support of this contention, the defendants point to the statement in *Lewis* disclaiming the suggestion in *Bounds* that the state "must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court." *Lewis*, 518 U.S. at 354.  From this statement, the defendants contend, it follows that "once an inmate is in court, he has not suffered an injury and a First Amendment claim cannot be sustained." *Doc. 21* at 6–7.  And because Rivera went to trial, he was not denied access to the court. *Id*. at 8. According to the defendants, Rivera "didn't lose the ability to pursue his excessive force claim; he merely lost." *Id*.

The question is whether at the time of the trial in *Rivera v. O'Haire,* it was clearly established that a prisoner had a right to assistance in the form of a law library or other legal assistance in presenting a claim at trial in a civil rights case. There has been surprisingly little written about that issue.  But as one commentator has observed, the statement from *Lewis* that right of access to the courts does not mean that the state must enable prisoners to litigate effectively once in court, which was dicta, could be read in either of two ways. 3 Michael B. Mushlin, *Rights of Prisoners* § 12:7: Does the right of access extend beyond filing a claim? (5th ed.).  "On way to read this statement is to conclude that the right of access ends when an inmate has gained the attention of the court to which the action is submitted." *Id*.  According to this commentator, "[h]owever, a stronger argument

can [be] made for the proposition that the right of access does not end with the

initial court filing":

> It does inmates little good to give them entry to court and then
> deprive them of the means of pressing their claim for relief
> through the myriad legal proceedings that occur from
> commencement of a suit until its conclusion.  Indeed, the
> *Bounds* Court implied as much when it contemplated the
> difficulty that an inmate would have in filing a reply brief
> without the assistance of a law library.  For this reason, many of
> the lower court decisions before *Casey*, interpreting the right of
> access, proceed on the assumption that the right extends to all
> phases of litigation.  Under this view, the *Lewis* Court simply
> meant that the right of access does not extend so far as to
> impose on the State the obligation to make inmates who are
> largely undereducated and unsophisticated about legal matters
> into effective litigators.  The Court made this point when it said
> that "[t]o demand the conferral of such sophisticated legal
> capabilities upon a mostly uneducated and indeed largely
> illiterate prison population is effectively to demand permanent
> provision of counsel, which we do not believe the Constitution
> requires."  The Court also affirmed that "[I]t is the role of
> courts to provide relief to claimants . . . who have suffered, or
> will imminently suffer actual harm . . . ."  A court cannot
> provide effective relief based only on a complaint.  Much more
> is required than that.  Therefore, there is a persuasive argument
> that the correct rule is one that recognizes a right of access to
> assistance following the filing of a complaint.  As one
> commentator put it for these reasons "… it makes sense that the
> obligation to assist prisoners with their legal claims extends to
> all stages of the litigation."

*Id*. (footnotes omitted).

Our job in connection with a qualified-immunity analysis is not, however, to

determine what is the best construction of the cases.  Rather, it is to determine

whether, at the relevant time, it was clearly established that a state's affirmative obligation to provide assistance to inmates in the form or a law library or legal assistance extended through the time of trial of an underlying civil rights action. The parties have not pointed us to any authority from either the Supreme Court or the Third Circuit so holding.  Nor have we have found any such authority.

Rivera relies on *Marshall v. Knight*, a case in which the Seventh Circuit rejected the argument that the right of access ends with the filing of a complaint or an appeal:

> . . . In the district court's view, *Lewis* "only requires that an inmate be given access to the courts to file a complaint or appeal, but state actors have no duty to assure that prisoners can litigate those claims effectively once they have been raised in court.  The right to access, goes no further than access."  We do not agree that *Lewis* confines access-to-courts claims to situations where a prisoner has been unable to file a complaint or an appeal.  Indeed, *Lewis* explained that a prisoner could prove a denial of access to the courts by showing that a complaint he prepared *and filed* "was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known." *Lewis,* 518 U.S. at 351, 116 S.Ct. 2174.  So a prisoner's simple ability to file a complaint is not dispositive. A prisoner states an access-to-courts claim when he alleges that even though he successfully got into court by filing a complaint or petition challenging his conviction, sentence, or conditions of confinement, his denial of access to legal materials caused a potentially meritorious claim to fail.

*Marshall v. Knight*, 445 F.3d 965, 969 (7th Cir. 2006).  *Marshall* supports the proposition that the right of access does not end with the filing a complaint.  Case

law from the Third Circuit suggests that same. *See Allah v. Seiverling*, 229 F.3d 220, 224 n.5 (3d Cir. 2000) (noting that construing the complaint liberally, the prisoner's allegation that "while he was in administrative segregation he did not have access to trained legal aids and as a result was unable to file a brief in his post-conviction appeal" was "sufficient to state a claim under [*Lewis v. ] Casey*"). But that authority does not pinpoint how far the right to legal assistance extends.

And while other courts have also indicated that the right of access does not end with the filing of the complaint, they have not indicated that the right extends as far as trial. Rather, they have suggested that a prisoner's right to affirmative assistance in the form of access to law libraries or other legal assistance is limited to the pleading or initial stages of a case. *See e.g. Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011) (stating that "the right to legal assistance is . . . limited to the pleading stage" and noting that "the 'pleading stage' encompasses the preparation of a complaint *and* the preparation of any filings necessary 'to rebut the State's arguments when a court determines that a rebuttal would be of assistance'" (citations omitted)), *overruled in part on other grounds by Coleman v. Tollefson*, 575 U.S. 532 (2015); *Brooks v. Buscher*, 62 F.3d 176, 180 (7th Cir. 1995) ("Meaningful access is denied only when a system of indirect access restricts too greatly a prisoner's ability to do basic research, that is, enough to enable him to formulate legal theories and get through the initial stages of a civil

suit."); *Knop v. Johnson*, 977 F.2d 996, 1006–07 (6th Cir. 1992) ("Inmates who

have signified a desire to go to court to present civil rights claims or claims for

post-conviction relief are not *ipso facto* entitled to legal *representation.* They are

entitled, rather, to 'access'—which means getting the courthouse door opened in

such a way that it will not automatically be slammed shut on them.  Once access

has been attained, whether through a complaint that is entirely homemade or

through one prepared by or with the help of a writ-writer or paralegal, the court

can decide whether the case presented is one that calls for the appointment of a

lawyer to represent the plaintiff."); *Bee v. Utah State Prison*, 823 F.2d 397, 399

(10th Cir. 1987) (concluding that legal assistance is not constitutionally required

beyond the preparation and filing of initial pleadings, and noting that "[o]nce an

inmate gains access to the court through a properly prepared and filed initial

pleading, the court will then be in a position to determine whether the claim has

any merit and whether the issues raised are unusually complex" such that counsel

should be appointed); *Nordgren v. Milliken*, 762 F.2d 851, 854 (10th Cir. 1985)

("Most courts have not interpreted *Bounds* as extending the right of access to the

courts so as to require special assistance to inmates further than the initial

pleading stage." (citing cases)).  None of these cases, however, holds that the

right to assistance extends to the trial stage of a civil rights action.

The parties have not pointed to controlling authority, or a robust consensus of persuasive authority, holding that an inmate's right to affirmative assistance in the form of either a law library or legal assistance extends to the trial stage of a civil rights case. Thus, we cannot say that at the time of the trial in *Rivera v. O'Haire* it was clearly established that Rivera had the right to access to a law library or other legal materials during trial. Accordingly, defendants Monko and Gilbert are entitled to qualified immunity.[5]

Although defendant Doe, the librarian, has not been served, and, thus, he has not raised qualified immunity, the court may address qualified immunity *sua sponte* "where it is clear on the face of the complaint that a party is immune from suit." *Newland v. Reehorst*, 328 F. App'x 788, 791 (3d Cir. 2009) (citing 28 U.S.C. § 1915(e)(2)(B)(iii), which provides that in a case in which the plaintiff is

---

[5] "Qualified immunity is a defense to claims for damages but not for injunctive or declaratory relief." *Harper v. Cty. of Delaware*, 779 F. App'x 143, 147 (3d Cir. 2019). In his amended complaint, Rivera seeks declaratory and injunctive relief in addition to damages. *Doc. 19* at 9. But Rivera is no longer incarcerated at SCI Retreat and he has not alleged facts from which it can reasonably be concluded that he will again be incarcerated at SCI Retreat under conditions that violate his right of access to the courts. Thus, his claims for declaratory and injunctive relief are moot. *See Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (holding that because the conduct about which Hamilton complained was no longer occurring, "neither a declaratory judgment nor an injunction" were available to Hamilton); *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (stating that "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims").

proceeding *in forma pauperis* "the court shall dismiss the case at any time if the

court determines that . . . the action . . . seeks monetary relief against a defendant

who is immune from such relief."); *see also Illes v. Kcomt*, No. 1:12-CV-0395,

2014 WL 297352, at *2 (M.D. Pa. Jan. 27, 2014) ("In appropriate cases, the district

court is entitled to address the defense *sua sponte*.").  Here, defendants Monko and

Gilbert raised the qualified immunity defense, and Rivera had an opportunity to

respond.  Defendant Doe is entitled to qualified immunity on the same basis as

defendants Monko and Gilbert.


## V.  Conclusion.

For the reasons set forth above, defendant Monko and Gilbert's motion to

dismiss the amended complaint (*doc. 20* ) is **GRANTED** on the basis of qualified

immunity, and defendant John Doe is also entitled to dismissal on the basis of

qualified immunity.  An appropriate order will follow.




*S/Susan E. Schwab*
Susan E. Schwab
Chief United States Magistrate Judge